**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **STEPH SHERER,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No.  01-860 (JDB)** |
| **UNITED STATES,** | |
| **Defendant.** | |

**MEMORANDUM OPINION**

On April 20, 2000, during protests coinciding with meetings of the World Bank and International Monetary Fund in Washington D.C., plaintiff Steph Sherer was grabbed by a United States Deputy Marshal and pushed to the ground.  She brought this claim seeking compensatory damages under the Federal Tort Claims Act ("FTCA") for injuries she alleges that she suffered from the incident.  From May 26, 2005 through June 2, 2005, this Court presided over a bench trial on plaintiff's FTCA claims.  Upon consideration of the testimony offered and evidence submitted at trial and the entire record in this case, including two video recordings of the incident, the Court will enter judgment in favor of defendant.

**BACKGROUND**

Pursuant to Fed. R. Civ. P. 52(a), the Court makes the following findings of fact on the basis of a full and careful review of the record in the case.  That review has included the live testimony of witnesses and video recordings that capture the entire incident forming the basis of this action.

1

## I.      Events Leading Up To The Incident

Plaintiff Steph Sherer is a community activist who was twenty-four years old and living in San Diego at the time of the events in this case.  5/26 Tr. at 1-44 (Sherer).  Prior to the protests giving rise to this case, plaintiff had participated in roughly one dozen demonstrations.  5/26 Tr. at 44 (Sherer).  She had acted as a liaison between the protesters and the police officers at some of these demonstrations, and she testified that she considers her relationship with police officers to be one of mutual respect.  5/26 Tr. at 44-45 (Sherer).  At some point, a nun who operated an activist organization in California invited Sherer to travel to Washington, D.C. to lobby political leaders on issues of globalization and human rights and to participate in protests set to coincide with the meetings of the World Bank and International Monetary Fund that were scheduled for April 2000.  5/26 Tr. at 46-47 (Sherer).

The protests were well-organized events.  Demonstrators from throughout the country gathered at a central meeting place in Washington.  Protest leaders organized a series of group meetings, including one in which lawyers explained that they had talked with law enforcement personnel and negotiated a rule that if police deemed a certain protest activity unlawful, they would make an announcement to that effect, and give the protesters an opportunity to disperse prior to an arrest.  5/26 Tr. at 47-49 (Sherer).  Plaintiff testified that the demonstrators intended to engage only in peaceful protest activity, and even required each protestor to consent to follow non-violent guidelines that were posted on the wall of the meeting house, and were described at meetings.  5/26 Tr. at 50 (Sherer).

Deputy United States Marshals (DUSMs) received intelligence briefings on the scope and intensity of the anticipated protest activity.  5/31 Tr. at 137-38 (Shealey).  Supervisors had

determined that there were likely to be major protests, ones that presented at least a possibility of acts of violence and the destruction of property.   6/1 Tr. at 171 (Waters).   The briefings focused on the protest activities during the then-recent World Trade Organization demonstrations in Seattle, where protesters had thrown objects and hazardous liquids at officers that included urine and bleach. 5/31 Tr. at 147 (Shealey).  DUSMs were shown videotapes of what had transpired in Seattle, and the supervisor in charge of the briefings discussed with them the possibility that similar incidents could take place in Washington.  5/31 Tr. at 177-79 (Shealey); 6/1 Tr. at 170 (Waters).  DUSMs were sent to Washington from all over the country to assist in security during the protests.  6/1 Tr. at 174-75 (Waters).

The demonstrations in Washington occurred between April 16 and April 20, 2000.  More than 600 protesters were arrested at the demonstrations.  5/31 Tr. at 139 (Shealey).  When arrested, the protesters often refused to provide their names, and instead used the names Jane Doe or John Doe.  5/26 Tr. at 66-67 (Sherer); 5/31 Tr. at 139 (Shealey).  The protesters were brought to the cellblock in D.C. Superior Court, where consistent with the D.C. Code, they were held until they provided their identities.  5/31 Tr. at 139-40 (Shealey).  Many arrestees provided their identities, allowing them to be released.  5/31 Tr. at 140 (Shealey).  More than 150 arrestees could not be identified, and those arrestees were transported to the D.C. jail.  5/31 Tr. at 141 (Shealey).  The U.S. Marshals Service did not treat the protesters any differently than they would any other arrestees.  5/31 Tr. at 142 (Shealey).

On April 19, 2000, an altercation took place between protesters and DUSMs in front of D.C. Superior Court.  5/31 Tr. at 142 (Shealey); 6/1 Tr. at 174-76 (Waters).  A crowd of people were attempting to enter a courtroom in which the cases of several of the protesters were being

3

heard.  5/31 Tr. at 142 (Shealey); 6/1 Tr. at 174-76 (Waters).  The U.S. Marshals Service had ordered the public to line up at the entrance to the courthouse.  5/31 Tr. at 142 (Shealey).  A protester bolted from the line and made an attempt to run through an employee entrance on the far right side of the courthouse.  5/31 Tr. at 142-43 (Shealey).  A DUSM grabbed the protester and used pepper spray on him, pinning him to the ground.  5/31 Tr. at 144 (Shealey).  One protester named Edmond Frost came to the assistance of the protester on the ground.  He inadvertently was sprayed in the face, as was another of the DUSMs.  5/31 Tr. at 33-36 (Frost); 5/31 Tr. at 147-48 (Shealey).

Following completion of several of the protests, plaintiff was scheduled to leave Washington on April 18, 2000, but volunteered to stay in town to assist certain of the protesters who remained in D.C. jail.  Her friends were holding the plane tickets, identification, and credit cards of many of the protesters, and she offered to stay behind to return these items when the protesters were eventually released.  Plaintiff was told that several people were gathering at the D.C. jail the next day to offer their support for the jailed protesters.  5/26 Tr. at 59-61 (Sherer).  When she arrived at the jail on the morning of April 19, she found about 20 protesters gathered in a designated grassy area outside of the jail.  The grassy area adjoins E Street, which runs east-west and dead-ends in the back entrance to the jail grounds.  5/26 Tr. at 64, 70 (Sherer).

During the morning of April 19, plaintiff and the other protesters waited in the grassy area, sang songs, and bantered with police officers.  5/26 Tr. at 65 (Sherer).  At some point, a member of the protesters' legal team arrived and explained that the prisoners would be taken from the jail to the courthouse at a later time.  Plaintiff testified at trial that the legal team was attempting to pursue a strategy by which it would attempt to represent all of the jailed protesters

4

at once, and negotiate a plea in all of their charges together.   5/26 Tr. at 66-67 (Sherer).   The

legal team therefore wanted two things to happen:  that the legal team have an opportunity to get

to the courthouse before the prisoners arrived, so that the prisoners would be represented by the

legal team rather than by appointed counsel; and that prisoners being transported to the court

knew to wait for the legal team and to request them as their counsel.   5/26 Tr. at 67 (Sherer).   The

protesters at the jail decided that they would attempt to communicate with the prisoners in the

transport van through signs, and mull about in front of the van to slow its arrival at the

courthouse.   5/26 Tr. at 68, 80 (Sherer)

## II.    The Incident on April 20

On the afternoon of April 20, the Superior Court ordered that roughly a dozen prisoners

be transported to the court "as fast as possible."   5/31 Tr. at 147-48 (Shealey); 6/1 Tr. at 180-81

(Waters).   A supervisor at the U.S. Marshals Service assigned four individuals to transport the

prisoners:  Detention Enforcement Officers (DEOs) Carl Teeter and Mark Artis were assigned to

operate the prisoner transport van, and DUSMs John Waters and Tim Griel were assigned to

operate an escort car that would accompany the van.   5/31 Tr. at 147-48, 162-63 (Shealey).

DEOs and DUSMs differ in several respects.   The principal responsibility of a DEO is the

cellblock:  DEOs process new arrests, guard and escort prisoners, and transport prisoners to and

from the courthouse.   5/31 Tr. at 149-50 (Shealey).   On April 20, DEOs Teeter and Artis were

not carrying pepper or OC (oleoresin capsicum) spray or extendable batons, and DEOs are not

used in a law enforcement capacity outside of the cellblock.   5/31 Tr. at 157-58 (Shealey).   DEOs

receive three weeks of training that is confined to the handling and movement of prisoners.   5/31

Tr. at 150-51 (Shealey).   DUSMs, on the other hand, are given full law enforcement duties and

receive approximately thirteen weeks of instruction that includes topics such as firearms training, defensive tactics and driving training.  5/31 Tr. at 150-51 (Shealey).

DEO Teeter drove the van, and DUSM Griel drove the lead vehicle.  6/1 Tr. at 182-83 (Waters).  The four officers picked up the prisoners from the jailhouse as they normally would. 5/31 Tr. at 193-94 (Griel).  The officers exited the jailhouse and took a right turn, driving west on jail grounds towards the back entrance that adjoins E Street.  As officers approached the exit to the jail, they saw the backs of Department of Corrections emergency response team members. 5/31 Tr. at 193-94 (Griel); 6/1 Tr. at 186-87 (Waters).  The response team parted, and the officers saw a crowd of protesters in front of the driveway to the jail grounds.  5/31 Tr. at 194-95 (Griel), 6/1 Tr. at 187 (Waters).  The officers turned on the emergency lights and sirens on both of the vehicles and DUSM Griel and DEO Teeter began to drive the lead vehicle and transport van slowly forward.  5/31 Tr. at 194-95 (Griel); 6/1 Tr. at 187 (Waters).

The protesters parted to allow the lead car to move forward at a slow pace, but they moved in front of, and on the sides of, the van carrying the prisoners.[1]  The protesters forced the van to come to a stop.  5/31 Tr. at 194-95 (Griel); 6/1 Tr. at 187-88 (Waters).  The protesters were gathered around the van beating drums, yelling, and throwing their hands up in the air.  5/31 Tr. at 13-14 (Frost);  5/31 Tr. at 195-96 (Griel).  More than one protester was carrying a video camera as well.  DUSM Waters had heard that prisoners had escaped out of transport vehicles, and was concerned for the safety of the officers and the prisoners.  6/1 Tr. at 195 (Waters).

_____

[1]  The findings set out in the next several paragraphs are based on the Court's observation of the live witnesses and the video recordings of the incident entered into evidence.

DUSM Griel radioed for assistance, and DUSM Waters exited the lead car to attempt to clear a path for the van.  5/31 Tr. at 201-02 (Griel); 6/1 Tr. at 188-89 (Waters), 6/2 Tr. at 43 (Murray).

DUSM Waters gestured towards the protesters to get them out of the way, and testified that he gave them verbal commands to that effect.  5/31 Tr. at 226 (Griel); 6/1 Tr. at 188-89 (Waters).  Witnesses for the plaintiff testified that they did not hear Waters give any verbal prompts or commands.  5/31 Tr. at 10-12 (Frost); 5/31 Tr. at 79-81 (Cookson).  DUSM Waters recognized at least one of the protesters at the scene as the individual (Edmond Frost) who came to the aid of the disobedient protester at the courthouse the day before.  6/1 Tr. at 191 (Waters). DUSM Artis exited the van to guide a protester out of the way of the van.  DUSM Griel also testified that he got out of the lead vehicle to help DUSM Waters at this point.  5/31 at 197 (Griel).  He extended his baton to warn a protester away from DUSM Waters – the protester retreated.  5/31 Tr. at 197 (Griel).  With a path cleared, DUSM Griel returned to the empty lead car and began driving it slowly down the street, with the van following behind it.  5/31 Tr. at 197 (Griel).

DUSM Waters ran down the street along side the lead car attempting to remove protesters from in front of the vehicle.  Protesters eventually gathered around the van again, forcing it to slow to a halt.  DUSM Waters soon found himself in a position where protesters were around him in several directions, and he backed up in an attempt to put the protesters in front of him. 6/1 Tr. at 189-90 (Waters).  DEO Artis also exited the van once again, telling people to get out of the way of the van and guiding the protesters out of the way of the van.  5/31 Tr. at 13-14 (Frost). Plaintiff was standing right in back of DEO Artis as he directed people out of the way.

Waters held up his OC (pepper) spray canister and testified that he warned the protesters to move

out of the way or he would spray them.  6/1 Tr. at 193-94 (Waters).  He can be seen on one of the

videotapes in the record moving his mouth in a manner consistent with his testimony that he was

warning the protesters.

At one point, DUSM Waters escorted Frost out of the way by gripping his arm and

walking him to the north side of the street.  6/1 Tr. at 196 (Waters).  Plaintiff was standing near

DUSM Waters when this occurred.  Plaintiff then walked around to the front of the lead car, and

DUSM Waters turned around to see her in that position.  6/1 Tr. at 197-98 (Waters).  The lead

car had begun moving forward slowly.  Waters ran up to her, and she stepped out of the way of

the lead car.  6/1 Tr. at 198 (Waters).  Waters testified that he intended to show her the pepper

spray canister in his right hand as a verbal warning.  6/1 Tr. at 199-200 (Waters).  Waters reached

for her shoulders, and she bent over slightly and placed her hands up towards her face.  6/1 Tr. at

199 (Waters).  Waters ended up grabbing the back of her neck with his left hand, as the videotape

shows.

Plaintiff turned her body and brought her hands up.  6/1 Tr. at 199-200 (Waters).  Waters

was concerned about his center of balance at this point, and used a windshield motion to push her

to the side and to the ground.  6/1 Tr. at 200-01 (Waters).  In doing so, Waters' right hand may

have made contact with plaintiff's sternum, but the strike was not forceful enough to set off the

sensitive OC (spray) canister in that hand.  6/1 Tr. at 200-01 (Waters).  The videotape confirms

that some contact by Waters' right hand to plaintiff's body may have occurred, but it does not

show a punch or similar forceful blow.  Plaintiff fell to the ground when Waters pushed her

aside, and the car and the van continued forward.  Waters claims that while he grabbed plaintiff,

he told her to stop blocking the car.  6/1 Tr. at 198-200 (Waters).  Plaintiff testified that she did

not hear Waters tell her anything.  5/26 Tr. at 86 (Sherer).  The videotape is not conclusive on

this issue.

DUSM Waters turned around and noticed that several of the protesters who had earlier

been standing in front of the van or the lead car and had been guided away had now returned to

the path of the van or were near Waters, taunting him and harassing him.  6/1 Tr. at 202-04

(Waters).  He attempted to chase away at least one of the protesters standing in front of the van.

6/1 Tr. at 201-03 (Waters).  Waters turned again and noticed that plaintiff had righted herself and

was now once more standing in front of the van.  6/1 Tr. at 203-04 (Waters).  The parties agree,

and the videotape confirms, that just a few seconds elapsed between plaintiff's prior fall to the

ground and her return to the front of the van.  The videotape shows plaintiff then walking slowly

backwards in a position near the left front bumper as the van slowly approached her.  Plaintiff

testified that she was dazed and attempting to catch her breath following the first contact with

Waters, and was concerned about a pain in her sternum and her inability to breathe.  6/1 Tr. at

82-84 (Sherer).  She was walking backwards at a slow pace, in a position approximately six feet

in front of the van at its driver-side corner (either in front of the driver-side headlight or slightly

to the left).  6/1 Tr. at 204-05 (Sherer).  Regardless of her precise position, she was close enough

to the van that she was impeding its path, as the videotape clearly confirms.

DUSM Waters recognized plaintiff as the protester that he had just grabbed and pushed to

the side.  He explained at trial that he perceived that plaintiff had intentionally moved back in

front of the van, was attempting to impede the van's progress, and therefore was actively resisting

his commands at this point.  6/1 Tr. at 206 (Waters).  DUSM Waters ran over to her and pushed

her out of the way of the slowly approaching van. 6/1 Tr. at 204-06 (Waters). The push lifted Sherer from her feet and she fell to the ground away from the path of the van. 5/26 Tr. at 85-86 (Sherer). DUSM Waters then turned around and ran to the north side of the van to chase away protesters on that side of the van. 6/1 Tr. at 206. Waters used his pepper spray on several protesters during the incident on E Street, including one protester who was holding a sign up right in front of him. He did not spray plaintiff. 5/31 Tr. at 19-20 (Frost); 5/31 Tr. at 79-81 (Cookson).

Waters was eventually able to return to the escort vehicle, and the vehicle and the transport van proceeded to the courthouse. No protesters were struck by the vehicles, and no protesters threw rocks, bleach, or used guns or knives during the incident. Plaintiff explained at trial that she had been walking in another direction to get into a car to drive to the courthouse herself when she heard that the transport van was exiting the jail. She ran to E Street, and arrived fairly late, when it was already two-thirds of the way down the street. The encounters between Waters and plaintiff occurred soon after she arrived at the scene. 5/26 at 79-80 (Sherer). Plaintiff testified that she intended to slow the emergency vehicles, that she heard the vehicles' sirens and saw their emergency lights, and that she knew that standing in front of the vehicle was illegal. 5/26 Tr. at 127-30 (Sherer). Plaintiff is under five feet tall and weighed 130 pounds at the time of the incident. 5/26 Tr. at 88 (Sherer).

Following the incident, DUSM Waters requested that an EMS Unit respond to the jail in light of his use of OC spray. Plaintiff said that she did not think that she was "that injured" at first, and she rose to her feet and came to the assistance of another protester who had been sprayed. After a few minutes, plaintiff felt her neck begin to stiffen, and she began to grow

panicked at her inability to move her neck.  5/26 Tr. at 90-91 (Sherer).  An ambulance arrived

and she was taped onto a board with a neck brace and taken the few blocks to a hospital.  5/26 Tr.

at 91 (Sherer).  Plaintiff testified that she suffered a torn ligament and a loss of movement in her

neck as a result of the second contact with Waters, although defendant contests the credibility of

several of the injuries.[2]  Soon after the altercation, DUSM Waters and Griel completed written

reports of the incident in which they described it in a manner consistent with the above account.

Def. Ex. 2, 7, 8 (reports).

## III.    The Training of DUSMs

DUSMs receive extensive training on the transport of prisoners and the proper use of

force.  6/1 Tr. at 8-9 (Ross).  DUSMs are taught that it is essential to keep a motorcade of

prisoners moving to prevent it from becoming a stationary target, and that they are responsible

for the safety of the prisoners who they are transporting.  5/31 Tr. at 253-54 (Ross); 6/1 Tr. at 8

(Ross); 5/31 Tr. at 200 (Griel).   DUSMs are instructed that the use of force should be objectively

reasonable in light of the circumstances, and that they should use the minimum force that is

reasonably necessary to control the subject.  Pl. Ex. 6, at 1-2; 6/1 Tr. at 9-10 (Ross).  In

particular, DUSMs are taught that reasonable force is an acceptable response to prevent an

escalating situation from becoming out of conrol.  6/1 Tr. at 31-32 (Ross).  DUSMs are

instructed not to use neck restraints or choke holds, but that they may grip individuals along the

back of the neck or shoulders to control them.  6/1 Tr. at 9 (Ross); 6/1 Tr. at 69 (Ross).  Trainees

are also taught to use a "soft empty hand technique" that involves holding an individual or

---

[2]  The Court ordered a bifurcated trial, receiving evidence only on liability issues, and
therefore heard only limited testimony regarding plaintiff's injuries.

moving them out of the way in order to disrupt their balance and distract them.  6/1 Tr. at 10 (Ross).

DUSMs are given instruction in the Use of Force Model, which provides a visual depiction of the options that are available to a DUSM in light of the officer's reasonable perception of the actions of the subject.  Gov't Ex. 5A; 6/1 Tr. at 15 (Ross); 6/1 Tr. at 206 (Waters).  One side of the pyamid lists the perceived conduct of the subject, ranging from "compliant" to "resistant (passive)" to "resistant (active)" to "assaultive (physical injury)" to "assaultive (serious physical injury/death)."  The other side of the pyramid details the force to which the officer should resort to respond to the perceive conduct of the subject.  For instance, when a subject is perceived to be "compliant," the Use of Force Pyramid provides that the officer should limit his response to "cooperative controls," which include verbal commands, "restraint applications," and "positioning strategies."  Gov't Ex. 5A.

According to the Use of Force Pyramid, when a subject is understood to be engaging in passive resistance -- meaning that although the individual is not acting to impede the conduct of the officer, he is not following the officer's order -- the officer is permitted to use "contact controls," which include revealing a baton or an OC spray canister or using a control hold to guide the individual away.  Gov't Ex. 5A; 6/1 Tr. at 17, 45 (Ross ).  When a subject is perceived to be engaging in "active resistance," meaning that the subject is mechanically hampering the completion of a law enforcement function, the Use of Force Pyramid directs the officer to resort to a variety of more forceful techniques to ensure the compliance of the subject, including the use of OC spray, takedowns, and the striking of pressure points on the body of the subject.  6/1 Tr. at 30-32, 42-43 (Ross).  The Use of Force pyramid depicts a sliding scale, one that permits an

officer to go directly to a certain level of force if the circumstances warrant.  6/1 Tr. at 18-19

(Ross).  The Use of Force model is a training tool to help students understand how to implement

force, although it is not official U.S. Marshal Service policy.  6/1 Tr. at 20-21 (Ross).[3]

## IV.    Procedural History

Plaintiff commenced this action on April 19, 2001, alleging that an officer named John

Murray and an unnamed officer used excessive force against her in violation of the Fourth

Amendment.  On October 31, 2001, plaintiff amended the complaint to add claims under the

Federal Tort Claims Act against the United States for battery and negligence.  Defendants moved

to dismiss the claims as a matter of law prior to discovery, and on October 18, 2002, this Court

granted the motion in part and denied it in part, dismissing the claims against John Murray and

the unnamed defendant but allowing the FTCA claims to proceed against the United States.

Following the completion of discovery, the United States moved for summary judgment.  On

February 28, 2005, the Court denied the motion for summary judgment, but ordered that the

proceedings would be bifurcated, with a trial on liability to occur first.  The Court held a four-day

bench trial on liability from May 26 to June 2, 2005, and heard closing arguments on August 12,

2005.  The parties produced several witnesses and exhibits at trial, including plaintiff and other

---

[3]  DUSM Waters had several years of experience as a Deputy at the time of the incident
giving rise to this litigation.  6/1 Tr. at 164 (Waters).  Prior to working as a DUSM, he had been
employed as a U.S. Border Patrol agent.  6/1 Tr. at 164-69 (Waters).  He had received training
both as a DUSM and a Border Patrol agent, including in motorcade security and crowd control.
6/1 Tr. at 165-69 (Waters); 6/2AM Tr. at 25-26 (Waters).

demonstrators present at the scene, DUSM Waters and other law enforcement personnel present at the scene, and two videotapes showing the incident at issue.[4]

## ANALYSIS

The law of the District of Columbia provides the rule of decision for plaintiff's FTCA claims.  See Hetzel v. United States, 43 F.3d 1500, 1502 (D.C. Cir. 1995).  Under the law of the District of Columbia, a "battery is an intentional act that causes a harmful or offensive bodily contact."  Etheredge v. District of Columbia, 635 A.2d 908, 916 (D.C. 1993).  Nonetheless, a law enforcement officer is privileged to use such force as appears reasonably necessary under the circumstances, although the use of excessive force will give rise to liability.  See Joyce v. United States, 795 F. Supp. 1, 5 (D.D.C. 1992); Hoston v. United States, 566 F. Supp. 1125, 1132 (D.D.C. 1983).  The actions of an officer are to be assessed "from the perspective of a reasonable officer on the scene."  Etheredge, 635 A.2d at 916.

Courts have looked to the Supreme Court's discussion of the constitutional standard for reasonable force in Graham v. Connor, 490 U.S. 386 (1989), in assessing the reasonableness of an officer's conduct under District of Columbia law.  See Rogala v. District of Columbia, 161 F.3d 44, 57 (D.C. Cir. 1998); Etheredge, 635 A.2d at 916-17.  In that case, the Supreme Court explained:

> The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . . .  The calculus of reasonableness must embody allowance for the

---

[4]  At trial, defendant presented opinion testimony on the reasonableness of the officers' conduct from a Senior Inspector of the USMS who provided training at the Federal Law Enforcement Training Center.  Because defendant did not attempt to call him as an expert witness, and his testimony is unhelpful as lay opinion testimony, the Court has not relied on his opinions in assessing the defendant's conduct in this case.

fact that police officers are often forced to make split-second judgments--in circumstances that are tense, uncertain, and rapidly evolving-- about the amount of force that is necessary in a particular situation.

Graham, 490 U.S. at 396-97. The Supreme Court has emphasized that "not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," is unreasonable or excessive force. Id. at 396 (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973)).

⎯⎯⎯⎯Measured against this standard, the Court concludes that the conduct of DUSM Waters while escorting the prisoner van on April 20, 2005, did not rise to the level of unreasonable force. The Court begins with the observation that plaintiff was one of a group of many individuals who were consistently and intentionally obstructing the path of emergency vehicles that were transporting prisoners from the D.C. Jail to the courthouse. Plaintiff admits that the effort to block the transport van was deliberate, concerted and illegal. She also acknowledges that she saw the emergency lights and heard the sirens on the vehicles. This is of no small concern. The blockade of a prisoner transport van presents a significant danger to the safety of the arrestees, the officers, the protesters, and the public at large. Although such a blockade does not give an officer carte blanche to use any measure of force he deems fit, it is nonetheless a substantial consideration in assessing the reasonableness of the officers' actions. See Graham, 490 U.S. at 396.

The Court also notes that by the time that plaintiff arrived at the scene, and placed herself in front of the transport van, the situation had escalated significantly. At first, the officers at the scene responded to the protesters with verbal commands, and guided them out of the path of the vehicles. Several of the protesters disobeyed these orders, and placed themselves back in front of the vehicles. DUSM Waters elevated his response in a proportional manner, gripping the arms of

the protesters to direct them out of the path of the van, and holding his canister of OC spray in the air.  The record -- and in particular the video recordings of the incident -- confirms that DUSM Waters also gave verbal warnings to protesters while holding the canister in the air.  This also did not succeed in clearing protesters from in front of the van.  Some of the protesters had returned to blocking the van or harassing DUSM Waters after earlier being directed out of the way.  In the extensive training he had received on the transport of prisoners, the need to keep a motorcade moving was stressed as a safety precaution.  The officers were significantly outnumbered, were surrounded, and were concerned about the security of a van full of prisoners. The officers reasonably believed that the situation presented at least a risk of escalating into violence (due to the conduct of other protesters earlier that year in Seattle).  Under these circumstances, it was certainly not unreasonable for DUSM Waters to grab plaintiff and shove her out of the way of the van, which is what he did in his first encounter with plaintiff.

It is plaintiff's second physical encounter with DUSM Waters that constitutes the core of this case because the injuries of which she complains were the result of that contact, not the earlier shove.  It is beyond dispute that plaintiff very quickly stood and returned to the front of the transport van, where the videotape shows her slowly walking backwards in what clearly appears to be a continuing attempt to impede the van.  DUSM Waters so perceived the situation. The Court finds DUSM Waters credible, and plaintiff not credible, on the question whether plaintiff returned to the front of the van to again attempt to impede it.  A review of the videotape confirms that she immediately went back to, or very near, the left front of the van and obstructed its progress.  At a minimum, a reasonable police officer could have so concluded under the circumstances.

Plaintiff complains that DUSM Waters did not first give her a verbal warning to remove herself from the path of the van.  DUSM Waters claims that he did provide such a warning to plaintiff, although the videotape is inconclusive and plaintiff disputes hearing any warning.[5]  The Court finds, however, that plaintiff was standing close to both DUSM Waters and DEO Artis when they were instructing other people to get out of the way of the emergency vehicles, even if they were not speaking directly to her.  It is inconceivable that plaintiff did not understand that the officers were attempting to move the protesters out of the way of the van.  After the officers provided verbal commands and gestures to the group of protesters, and attempted to guide protesters out of the way of the vehicles, the officers were not required -- either by explicit policy or general reasonableness -- to ensure that each protester received a personalized warning before resorting to non-deadly physical force.[6]

Plaintiff contends that the proper response to the actions of the protesters was demonstrated by DEO Artis, who limited his activities to calmly guiding the protesters out of the way.  But DEOs and DUSMs have different responsibilities.  DEOs are not used in law enforcement outside of their responsibilities in the cellblock, and DEO Artis did not even possess

---

[5]  It is plausible that DUSM Waters provided a warning that plaintiff did not hear, in light of the noise of the sirens and the shouting of the protesters.

[6]  Plaintiff approaches the case from the perception of an individual who arrived at the scene well into the events, apparently after the officers had given several of their initial warnings. DUSM Waters viewed the incident from the perspective of an officer attempting to address a potentially dangerous situation through a series of escalating responses without success. Certainly, plaintiff entered an escalating and unfolding scenario late in the game, and may even be said to have borne the brunt of the response for the ongoing and sustained insubordination of others.  However, the Court cannot say that DUSM Waters' response was unreasonable in light of plaintiff's own active resistance and the events of the incident on E Street as they unfolded and would be perceived by a reasonable officer who was there the entire time (as DUSM Waters was).

an OC spray canister or a baton.  DUSMs, on the other hand, receive extensive training in

defensive tactics and driving training, and are tasked with law enforcement responsibilities.  The

different responsibilities are illustrated here -- the DEOs had the transport responsibility while

the DUSMs were charged with escort, protection, and ensuring safety.  It is inappropriate to

require a DUSM in this situation to act in a manner that is fully consistent with the conduct of a

DEO.  Moreover, the efforts of DEO Artis were unsuccessful.  Protesters had continued to stop

the vehicles, and some of the protesters had returned to the path of the transport van and

continued obstructing and harassing DUSM Waters after being guided out of the way.  Hence, by

the time DUSM Waters pushed plaintiff, the situation had escalated beyond what DEO Artis

confronted only a few minutes earlier.

     A better measure of the reasonableness of the conduct of DUSM Waters is the Use of

Force Model introduced into evidence in this case, and which permits an officer to use

takedowns and the striking of pressure points in response to the active resistance of a subject.

See United States v. Brugman, 364 F.3d 613, 617 (5th Cir. 2004) (looking to Use of Force Model

to assess claim of unreasonable force by federal law enforcement officials).  Plaintiff was

actively resistant:  she was impeding the progress of emergency vehicles and disregarding the

efforts of officers to guide people out of the way.  The officers had already resorted without

success to many of the less drastic responses listed in the Use of Force Model, such as verbal

commands, moving protesters out of the way, and displaying the OC spray.  Indeed, DUSM

Waters had already moved plaintiff out of the way once, but she quickly returned to impede the

transport van.  One might wish, in hindsight, that DUSM Waters had used more caution the

second time in his treatment of plaintiff.  This Opinion thus should not be read to ignore the

severity of any injuries plaintiff may have received as a result of the incident or to approve of the precise reaction of DUSM Waters to the circumstances presented.  But the Court simply cannot say that DUSM Waters acted with unreasonable force.  Plaintiff received ample warning from the context and specific actions directed to her, but chose not to heed those "warnings" in returning to a position where she was actively, or at least reasonably perceived as, impeding an emergency transport vehicle in an escalating setting fraught with risk.

Finally, the result is no different if plaintiff casts her legal claim as one alleging negligence rather than battery.  The D.C. Court of Appeals recently explained that a plaintiff may not state a negligence claim that simply restates the allegations from the battery claim:  a plaintiff "may not bootstrap from the battery proof alone, as one may not commit a negligent assault." District of Columbia v. Chinn, 839 A.2d 701, 708-09 (D.C. 2003); see Sabir v. District of Columbia, 755 A.2d 449, 452 (D.C. 2000) (holding that "the negligent assaulting of someone based strictly on a negligence theory" does not constitute a valid cause of action).  That is precisely what plaintiff alleges here.  Plaintiff simply recites that the officers "negligently caused the assault and battery, arrest and detention of plaintiffs," without identifying an independent duty of care that the officers failed to satisfy.  Such a claim does not state an independent cause of action for negligence.  See, e.g., Sabir, 755 A.2d at 452 (rejecting negligence claim alleging merely that officers "negligently caused the assault and battery, arrest and detention of plaintiffs").  Even if plaintiff were permitted to state her cause of action in the alternative as a claim of negligence, she fails to demonstrate that the officers violated a duty of care to plaintiff, for the same reasons stated in the discussion above.

## **CONCLUSION**

For the foregoing reasons, judgment will be entered in favor of the United States on plaintiff's FTCA claim.  Under the circumstances presented, the Court concludes that plaintiff has not carried her burden of establishing that unreasonable or excessive force was used.  In so concluding, the Court neither condemns plaintiff's protest activities nor praises DUSM Waters' precise reaction.  Rather, the Court simply concludes that from the perspective of a reasonable police officer on the scene at the time, taking into account the entire context requiring "split-second judgments" when faced with "circumstances that are tense, uncertain, and rapidly evolving," the shove of plaintiff at issue here does not amount to unreasonable force.  See Graham v. Connor, 490 U.S. at 396-97.

A separate order will be issued.


_____/s/_____
JOHN D. BATES
United States District Judge

Dated:   September 20, 2005

Copies to:

**David Stephen Greene**
APFEL & GREEN, PC
50 West Montgomery Avenue, Suite 200
Rockville, MD 20850-4216
Email:  dgreene@dgreenelaw.com

**Douglas Robert Smith**
50 West Montgomery Avenue, Suite 200
Rockville, MD 20850
Email: doug@dougatlaw.com

**Oliver McDaniel**
U.S. ATTORNEY'S OFFICE
555 Fourth Street, NW, Room 10-824
Washington, DC 20530
Email: Oliver.McDaniel@usdoj.gov